IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

CREIGHTON SULECKI,                    :          CASE NO. 1:13-CV-1597

Plaintiff,                            :

vs.                                   :

COMMISSIONER OF SOCIAL SECURITY,      :
                                                 MEMORANDUM DECISION AND
DEFENDANT.                            :          ORDER

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C § 636(c) and FED. R. CIV. P. 73, the parties

in this case consented to have the undersigned United States Magistrate Judge conduct any and all

proceedings in the case, including ordering the entry of a final judgment.  Plaintiff seeks judicial

review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB)

under Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) under Title

XVI of the Act.  Pending are the Briefs on the Merits of the parties (Docket Nos. 15 and 16).  For

the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II.  PROCEDURAL BACKGROUND.

On August 16, 2010, Plaintiff, with the assistance of the Social Security Administration

(Administration), completed  applications for DIB and SSI, alleging that he became disabled on

January 15, 2009 (Docket No. 13, pp. 194-195; 198-205 of 705).   The applications were denied

initially and upon reconsideration (Docket No. 11, pp. 129-131; 139-141; 143-145; 146-148; 150-

153; of 705).  Administrative Law Judge (ALJ) Kendra S. Kleber conducted a hearing on January 13, 2012 in Cleveland, Ohio (Docket No. 11, p. 12 of 705).  On January 26, 2012, the ALJ issued a decision denying Plaintiff's application for DIB and SSI (Docket No. 11, pp. 104-124 of 705).  On June 11, 2013, the Appeals Council denied review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 5-7 of 705).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision (Docket No. 1).

### III.  FACTUAL BACKGROUND.

At the administrative hearing, Plaintiff, represented by counsel, and Vocational Expert (VE) Ted Massey, appeared and testified.

### A.  PLAINTIFF'S TESTIMONY.

Plaintiff was 52 years of age,  5'10" tall and  weighed 245 pounds.  He attended the University of Toledo but completed less than a year because of his inability to concentrate. Although he maintained a commercial driver's license, Plaintiff claimed that he rarely drove because of pain in his back, shoulder and right knee (Docket No. 11, pp. 19; 24- 26, 28, 36 of 705).

Plaintiff was last employed in 2008.  For a period of six months, Plaintiff was a part-time security guard at a vacant mall (Docket No. 11, pp. 20-21 of 705).  In 2004 and 2005, Plaintiff was employed in a full-time capacity as a truck driver for Medic Drug.  He loaded and unloaded his truck and delivered products to different stores (Docket No. 11, p. 21 of 705).  While employed by  the City of Euclid , Plaintiff was a light equipment operator.  He drove large trucks  for the streets and sewer department, poured cement; jack hammered asphalt; loaded up salt in the trucks, cleared sewers,  paved streets and plowed snow from the street (Docket No. 11, p. 22-23 of 705).  Plaintiff worked for a number of years as a forklift operator for the Van Dorn Company until the business closed (Docket No. 11, p.23- 24 of 705).

2

Plaintiff was diagnosed and/or undergoing treatment for the following:  (1) meniscal tear; (2) pinched nerve in his neck; (3) hypertension; (4) hypothyroidism; (5) hyperlipidemia; (6) diabetes and (7) depression.  He anticipated that surgery would be required to repair the meniscal tear (Docket No. 11, pp. 32-35 of 705).  The pinched nerve in his neck caused numbness in his left hand and arm and shoulder impingement (Docket No. 11, p. 39 of 705).  He was prescribed medication to control his thyroid, hypertension, hyperlipidemia, diabetes, depression and pain (Docket No. 11, pp. 30-31; 33 of 705).  Plaintiff  claimed that prolonged use of his right leg caused pain, standing for more than five minutes caused his lumbar spine to freeze and he could not reach over his head with either arm (Docket No. 11, pp. 25-26; 38 of 705).

Plaintiff could get in the shower, stand for five minutes while showering, maintain his hygiene and dress himself.  Because bending was difficult,  Plaintiff improvised by grabbing the leg of his pants and lifting his leg high enough to put his socks on (Docket No. 11, pp. 27-28 of 705).  Plaintiff did not vacuum, shovel the driveway or cut the grass (Docket No. 11, p. 27 of 705).  Plaintiff was more comfortable while sitting in a recliner.  In fact, he could sit for up to an hour before he had to move around.  If sitting in a different chair or sofa, his back muscles would tighten and hurt.  Even with narcotic pain relievers, Plaintiff described his pain as a six or seven with zero being no pain.  The side effects of his medications included marked dizziness (Docket No. 11, p. 29-30 of 705).

B.      THE VE'S TESTIMONY.

The VE, a vocational consultant, testified that while the examples of jobs were consistent with the information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country, the employment figures were based on his

experience and the Department of Labor and the Bureau of Labor Statistics (Docket No. 13, pp. 44;

46; 48 of 705; Www.occupationalinfor.org.).

VE categorized Plaintiff's past relevant work as he performed it:

| JOB | SKILL LEVEL | EXERTION LEVEL |
|---|---|---|
| Security Guard DOT 372.667-034 | Unskilled work is the least complex type of work, requiring little or no judgment. 20 C. F. R. §§ 404.1568(a); 416.968(a). | Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C. F. R. §§ 404.1567(b); 416.967(b). |
| City street maintenance worker DOT 899.684-014 | Semi-skilled work is more complex than unskilled work and distinctly simpler than the more highly skilled types of jobs. Such work requires more judgment than unskilled occupations.  20 C. F. R. §§ 404.1568(b); 416.968(b). | Medium work involves lifting no more than 50 pounds at a time with frequent lifting and carrying of objects weighing up to 20 pounds. 20 C.F.R. §§ 404.1567(c); 416.967(c). |
| Construction worker DOT 869.687-026 | Unskilled | Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. 20 C.F.R. § § 404.1567(e); 416.967(e). |
| Material Handler DOT 929.687-030 | Semi-skilled work | Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds. 20 C.F.R. § § 404.15at |

(Docket No. 11, pp. 46-47 of 705).

The ALJ posed the *first* hypothetical:

Assume an individual who is the same age, education and past relevant work experience as Plaintiff, who is able to perform a limited range of light work, that is to say that he's able to lift 25 pounds occasionally, 10 pounds frequently, able to stand or walk for four hours out of eight hours and sit for four hours out of eight, perform work that does not require climbing ladders or kneeling or crawling, no more than occasional reaching overhead with the right upper extremity and it does not involve commercial driving and the work is limited to routine repetitive tasks with no more than occasional and superficial interaction with the public.  Could such person perform Plaintiff's past work?

While this hypothetical person could not perform Plaintiff's past work because the standing

and walking would exceed four out of eight hours, he could perform the following light, unskilled

work that is available as follows:

4

| JOB/DOT NUMBER | NUMBER OF JOBS IN NORTHEAST OHIO AND NATIONALLY |
|---|---|
| Wire worker 728.684-022 | 650/90,000 |
| Electronics worker 726.687-010 | 450/60,000 |
| Bench Assembler 706.684-022 | 600/90,000 |

(Docket No. 11, pp. 46; 47; 48; 49 of 705).

Plaintiff's counsel posed the following hypothetical

Assume the same individual, same age, education and background, and same residual functional capacity with the additional limitation that the hypothetical person would only be able to have occasional contact and superficial contact with the public, co-workers and supervisors.

The VE answered that with that addition, the jobs and numbers of jobs would be the same

(Docket No. 11, p. 50 of 705).

Counsel posed a *third* hypothetical:

Assume the same individual, same age, education and background, and same residual function, except that the hypothetical person could just occasionally manipulate using his or her hands.  Could this individual perform the jobs previously identified?

The VE explained that the individual would not be able to perform any of the jobs cited

because he or she would not be competitive with production goals (Docket No. 11, p. 50 of 705).

### IV.  MEDICAL EVIDENCE.

**A.**     **DR. E. HILL**

From February 20, 2003, through January 7, 2012, Plaintiff experienced external and internal

5

stressors caused by deterioration of his physical health, family relationships and financial challenges. Dr. Hill compartmentalized the symptoms of his problems into medically diagnosable impairments and treated him for ADHD and mood disorder, not otherwise specified (NOS).  As part of the holistic approach to mental wellness, Dr. Hill nurtured individual and family change through psychotherapy.  During these sessions, Plaintiff, his wife and son participated and shared their feelings on issues such as substance abuse, chronic pain and obesity.  Plaintiff was taking an antidepressant and narcotic pain relievers.  Plaintiff's wife and son were prescribed antidepressants. Dr. Hill was instrumental in attempting to mend the family's mental health and monitor side effects and drug interactions (Docket No. 11, pp. 438- 576; 577-705 of 705).

**B.**     **SAGINAW VALLEY BONE & JOINT CENTER**.

On April 13, 2006, Plaintiff was injured when he stepped inside a crate and he felt a pulling sensation in his knee.  By July 17, 2006, the pain and swelling had progressed on the medial side of the knee to the extent that an arthroscopy was ordered (Docket No. 11, pp. 301-302 of 705).  On August 16, 2006, the postoperative examination of his right knee revealed continued pain but Plaintiff did not ambulate with crutches and he was working on increasing his level of physical activity (Docket No. 11, p.300 of 705).

**B.**     **MR. RICHARD HALAS**

Mr. Richard Halas, a clinical psychologist, conducted a clinical interview and mental status examination on October 20, 2010, to determine his current functioning levels to facilitate long-term disability.  Plaintiff drove to the appointment.  Mr. Halas observed that Plaintiff appeared to have little or no difficulty sitting, standing or walking; his ability to lift and handle objects was assessed as poor to below average; his hearing was intact and his speech was slow and constricted; and  he

was anxious and tearful (Docket No. 11, p. 287 of 705).

Mr. Halas used the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS to categorize Plaintiff's impairments.  Better known as the DSM-IV, this manual published by the American Psychiatric Association uses a multi-axial approach for diagnosing psychiatric disorders in five dimensions.  Mr. Halas diagnosed Plaintiff with a depressive disorder, NOS; an anxiety disorder NOS and polysubstance abuse.  He identified the events in Plaintiff's life that impacted the disorders such as psychosocial stressors, financial concerns, health concerns and dependency on his spouse.  The highest level of functioning was a 45 for serious symptoms; he had significant psychological issues, no friends, but he was in a stable relationship with his wife.

Finally, Mr. Halas determined that Plaintiff's mental ability to understand, remember and follow instructions was mildly impaired; his intellectual level was in the low average range; his mental ability to maintain attention and concentration and perform simple, repetitive tasks was mildly impaired; his mental ability to relate to others was moderately impaired; his mental ability to withstand the stresses and pressures associated with most day-to-day activities was moderately impaired; and that his symptoms of anxiety and depression were likely to be exacerbated under the pressures of a normal work setting (Docket No. 11, pp. 284-289 of 705).

## C.    SHIAWASSEE COMMUNITY HEALTH CENTER

Plaintiff received health care services from February 2006 through June 2011.  Generally, Plaintiff was described as hyperactive, displaying disorganized thoughts when conversing and he had obvious difficulty concentrating.

Plaintiff tested positive for marijuana metabolites on June 11, 2009.  In July 2009, Plaintiff was prescribed Methadone, an opiod, for back pain.  In November 2009, Plaintiff was diagnosed and treated for hypothyroidism and depression.  Plaintiff's thyroid disorder improved after replacement

therapy.

       Plaintiff had the following limitations:

1.      No lifting, pushing or pulling in excess of twenty-five pounds.
2.      Standing and walking tolerance was four hours in an eight-hour day.
3.      Sitting tolerance was four hours in an eight-hour day.
4.      Duration work day was two to three hours.
5.      Plaintiff needed to eat regular meals and remain hydrated (Docket No. 11, pp. 292-293; 374 of 705; www.nlm.nih.gov).

On January 22, 2010, the dosage of Metformin, a medication used alone or in conjunction with exercise and diet to control blood sugar concentration, was increased to assist in regulating Plaintiff's blood glucose level (Docket No. 11, pp. 349; 369 of 705; www.drugs.com).  Plaintiff obtained refills of Methadone; Ritalin, a central nervous system stimulant that affects chemical and nerves that contribute to hyperactivity and impulse control; and Trazodone, an antidepressant, on February 23, 2010 and again on March 23, 2010 (Docket No. 11, pp. 347; 348 of 705; www.drugs.com).  On June 18, 2010, Plaintiff reported feeling better taking the thyroid medication once monthly; the Methadone was working well and Plaintiff was trying to engage in more physical activity (Docket No. 11, p. 344 of 705).  On July 8, 2010, Plaintiff requested that the Ritalin regimen be modified to include a dosage twice daily (Docket No. 11, p. 343 of 705).  On August 6, 2010, results from chemical tests showed an elevated glucose level and Plaintiff was doing well on Ritalin and Methadone (Docket No. 11, pp. 342; 361 of 705).  On October 1, 2010, Plaintiff was severely stressed after he attended a concert and smoked marijuana laced with cocaine.  He admitted improvement in his affective state since his thyroid medications were adjusted (Docket No. 11, p. 340 of 705).  On October 29, 2010, Plaintiff reported that his back pain was controlled with medication.  His inability to concentrate was not.  Adderall, a combination medication used to treat ADHD, was added to his regimen (Docket No. 11, p. 339 of 705; www.webmd.com/drugs/drug-

8

63163-Adderall+Oral.Aspx).   On November 23, 2010, Plaintiff reported that the injection of testosterone affected his mood; that the Adderall was effective although he continued to entertain racing thoughts; and that he had some back tightness (Docket No. 11, p. 338 of 705).

On January 18, 2011, Plaintiff requested an increase in the dosage of Methadone to relieve chronic back pain which was more pronounced in midday (Docket No. 11, p. 337 of 705).   On February 15, 2011, Plaintiff reported that he had a syncopal episode and his knee was painful and swollen.   He reported that the Methadone and Adderall were effective (Docket No. 11, p. 336 of 705).   On April 12, 2011, Plaintiff explained that his thoughts were racing and he could not concentrate.   He was enthusiastic about getting a cortisone shot later that week (Docket No. 11, p. 334 of  705).   On May 10, 2011,  Plaintiff was oriented and his mood/affect was appropriate. Although his knee was tender to touch, his gait was stable.   Plaintiff's cholesterol and triglyceride levels were elevated above normal levels (Docket No. 11, pp. 333; 359-360 of 705).   Plaintiff reported on May 31, 2011 that he was "going to the island for vacation" and he requested his prescriptions before leaving (Docket No. 11, p. 332 of 705).   On June 21, 2011, Plaintiff requested a refill of Lisinopril, a medication used to treat hypertension (Docket No. 11, p. 331 of 705; www.drugs.com).

**D.      DR. WILFREDO M. PARAS, M.D.**

Dr. Paras, an internal medicine specialist, conducted a one time internal medical disability examination on December 10, 2010 and concluded that Plaintiff's diabetes, hypothyroidism and hypertension were controlled with medication; Plaintiff had limited motion in his right shoulder, right elbow and dorsolumbar spine,  and results from the diagnostic tests showed normal alignment and no wedge fracture or compression deformity; no significant spurring or intervertebral disc space narrowing and no abnormal soft tissue calcifications.   It was Dr. Paras' opinion that Plaintiff was

capable of performing light work (Docket No. 11, pp. 304; 306-307; 308-313 of 705).

**E.      DOROTHY A. BRADFORD, M. D.**

On June 29, 2011, Plaintiff presented to Dr. Bradford, an internal medicine specialist,

complaining of knee and back pain.  Dr. Bradford completed a manual muscle test and determined:

> 1.      Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees, feet and great toe extensors against maximal resistance.
> 2.      Plaintiff's ability to grasp, manipulate, pinch and engage in fine coordination was within normal limits.
> 3.      Plaintiff's range of motion in his cervical spine, elbows, writs, hands-fingers and ankles were normal.
> 4.      Plaintiff's range of motion in his dorsolumbar spine, shoulders, hips and knees was abnormal, rendering the dorsolumbar spine, shoulder joints, hip joints and knee joints less stable (Docket No. 11, pp. 381-384 of 705; www.healthgrades.com/physican/dr-dorothy-bradford).

Dr. Bradford concluded that Plaintiff:

> 1.      Cannot reach over the chest.
> 2.      Has bilateral shoulder problems and torn cartilage in the right knee.
> 3.      Is on chronic Methadone for low back pain.
> 4.      Has activity restrictions including bending, climbing, kneeling, no lifting over 5 pounds, operating machinery, pulling, pushing, reaching, squatting, no standing for long periods of time, walking over one block and on uneven surfaces.  (Docket No. 11, pp. 385-388 of 705).

Dr. Bradford ordered radiological tests of the right knee.  The results showed:

> 1.      Spurring of the anterior-superior and the anterior-inferior aspects of the patella.
> 2.      Spurring at the anterior articular surface of the proximal tibia.
> 3.      Slight narrowing of the medial joint compartment due to early degenerative disease.
> 4.      No joint effusion.
> 5.      No fracture or bone destruction.
> 6.      There may be a loose body.
> 7.      There is no chondrocalcinosis (calcification of cartilage).

(Docket No. 11, p. 390 of 705; STEDMAN'S MEDICAL DICTIONARY, 77090 (27th ed. 2000).

**F.      SEVERANCE RADIOLOGY SERVICES, INCORPORATED.**

Dr. Susan H. Lackey, D.O., an internal medicine specialist, conducted a consultative

examination on July 21, 2011, after which she concluded that:

10

1.    Plaintiff had decaying teeth.
2.    Plaintiff's diabetes was controlled.
3.    Plaintiff's psoriasis was stable.
4.    Plaintiff had a cervical spine disorder with numbness.
5.    Plaintiff had lumbago syndrome.
6.    Plaintiff's glucose and triglyceride levels were significantly elevated over the normal reference range

(Docket No. 11, pp. 391-395; 397-398 of 705; www.healthgrades.com/physician/dr-susan-lackey).

On September 23, 2011, Plaintiff complained of deteriorating eyesight and Dr. Lackey determined that Plaintiff's diabetes was poorly controlled.  Plaintiff was referred to a diabetes educator and Glyburide, another medication used with diet and exercise to help control blood sugar, was added to the drug regimen.  Additionally, Plaintiff had suboptimal control of his hyperlipidemia and Dr. Lackey began treatment with Pravastatin, a lipid-lowering compound (Docket No. 11, pp. 403-409 of 705; PHYSICIAN'S DESK REFERENCE, 2006 WL 367855 (2006); www.drugs.com).  The lipid panel performed on November 21, 2011, showed an elevated triglyceride level (Docket No. 11, p. 410 of 705).

On January 10, 2012, Dr. Lackey completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY REPORT and made the following determinations:

1.    Plaintiff's ADHD affected his physical condition.
2.    Plaintiff was incapable of performing even low stress jobs.
3.    Plaintiff could not walk a city block without rest or severe pain.
4.    Plaintiff could sit at one time for 30 minutes.
5.    Plaintiff could stand at one time for 15 minutes.
6.    Plaintiff could sit and stand/walk for less than two hours in an 8-hour workday.
7.    Plaintiff needed to incorporate periods of walking around every thirty minutes.
8.    Plaintiff could rarely lift and carry in a competitive work environment less than 10 pounds.
9.    Plaintiff could frequently turn his head right and look up but he could never twist, stoop, crouch/squat or climb ladders.
10.   Plaintiff was likely to be absent from work more than four days per month.
11.   Plaintiff had limited vision.

(Docket No. 11, pp. 428-437 of 705).

11

**F.    CLEVELAND CLINIC.**

At the PAIN MANAGEMENT CENTER, Plaintiff was diagnosed with brachial neuritis or radiculitis, NOS.  Dr. Pasha Saeed, M.D., administered a cervical epidural steroid injection on August 1, 2011 (Docket No. 11, pp. 399-401 of 705).

Plaintiff presented on November 1, 2011, to the DEPARTMENT OF ORTHOPAEDICS, where he described his longstanding history of right knee pain.  Diagnosed with right knee osteoarthritis and a meniscus tear, Plaintiff proceeded with a cortisone injection in the right knee (Docket No. 11, pp. 413- 415 of 705).

On November 14, 2011, Plaintiff presented for a second cervical epidural steroid injection (Docket No. 11, pp. 416-419 of 705).

**G.    PLAINTIFF'S WEIGHT.**

The following table contains medically documented evidence of Plaintiff's weight:

| PAGE | DATE | WEIGHT IN POUNDS |
|------|------|------------------|
| Docket No. 11, p. 522 of 705 | May 10, 2008 | 286 |
| Docket No. 11. p. 500 of 705 | April 18, 2009 | 262½ |
| Docket No. 11, p. 499 of 705 | July 11, 2009 | 266 |
| Docket No. 11, p. 496 of 705 | September 5, 2009 | 255 |
| Docket No. 11, p. 654 of 705 | November 4, 2009 | 261 |
| Docket No. 11, p. 549 of 705 | December 12, 2009 | 259½ |
| Docket No. 11, p. 548 of 705 | January 9, 2010 | 257½ |
| Docket No. 11, p. 545 of 705 | February 6, 2010 | 256 |
| Docket No. 11, pp. 538; 543 of 705 | April 3, 2010 | 252½ |
| Docket No. 11, p. 537 of 705 | May 1, 2010 | 254½ |
| Docket No. 11, p. 223 of 705 | August 16, 2010 | 248 |
| Docket No. 11, p. 532 of 705 | September 18, 2010 | 246 |
| Docket No. 11, p. 530 of 705 | October 16, 2010 | 252½ |

| Docket No. 11, p. 286 of 705 | October 20, 2010 | 255 |
|---|---|---|
| Docket No. 11, p. 528 of 705 | November 13, 2010 | 243¾ |
| Docket No. 11, p. 569 of 705 | June 4, 2011 | 256 |
| Docket No. 11, p. 563 of 705 | August 6, 2011 | 252½ |
| Docket No. 11, p. 561 of 705 | September 10, 2011 | 248 |
| Docket No. 11, p. 558 of 705 | October 8, 2011 | 253½ |
| Docket No. 11, p. 557 of 705 | November 5, 2011 | 250½ |
| Docket No. 11, p. 552 of 705 | January 7, 2012 | 253 |

## V. THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are found at 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920, respectively. The statutes are identical for purposes of evaluation.

SSI and DIB are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)). To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires. *Key v. Callahan*, 109 F. 3d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520. *Colvin*, *supra*, 475 F. 3d at 730.

13

First, the claimant must demonstrate that she or he is not currently engaged in "substantial gainful activity" at the time he or she seeks disability benefits. *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

Second, the claimant must show that he or she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. *Id.*

For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, claimant is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

After careful consideration of all the evidence, the ALJ made the following findings:

**Step 1**: Plaintiff last met the insured status requirements of the Act through June 30, 2005. Because Mr. Sulecki has alleged disability on and since January 15, 2009, he does not meet the insured status requirements for a period of disability and disability insurance benefits under Title II of the Act. He did earn quarters of coverage as a Medicare-qualifying government employee when he worked for the City of Euclid during calendar years 1997-2001. Accordingly, Mr. Sulecki may be eligible for Medicare if he can establish disability beginning on or before June 30, 2011; however, he had not engaged in substantial gainful activity since January 15, 2009, the alleged onset

14

date.

      **Step 2**:   Plaintiff had severe impairments, specifically, degenerative facet changes in the lumbar spine; depression; obesity; and a torn meniscus in the right knee.

      **Step 3**:   Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  He did, however, have a slightly reduced capacity for light work except that he retained the capacity to perform only tasks that did not require him to climb ladders, scaffolds, kneel or crawl; reach overhead with his right arm frequently; perform commercial driving; perform more than simple, routine, repetitive tasks in an environment where he would be distracted by more than occasional, superficial interactions with others, including co-workers, supervisors, and the public.

      **Step 4**:   Plaintiff was unable to perform any past relevant work.

      **Step 5**:   Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

      In conclusion, Plaintiff has not been under a disability, as defined in the Act, from January 15, 2009 through January 26, 2012 (Docket No. 11, pp. 107-124 of 705).

## VII. Standard of REVIEW.

      A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

      "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id*. at 740-

741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS.

Plaintiff seeks reversal and remand of the ALJ's decision for reasons that:

1.    The ALJ failed to consider Plaintiff's obesity at step three of the sequential evaluation.

16

2.     The ALJ failed to adopt Dr. Carter's opinion in its entirety.
3.     The ALJ failed to give good reasons for disregarding Dr. Lackey's RFC.
4.     The ALJ failed to meet the burden of proof at step five of the sequential evaluation.
5.     The hypothetical questions failed to include the RFCs provided by Drs. Carter and Lackey.

Defendant responded that:

1.     Plaintiff does not meet or medically equal any listings.
2.     The ALJ considered Plaintiff's obesity at each stage of the sequential evaluation.
3.     The ALJ appropriately evaluated the opinion of Plaintiff's treating physicians.
4.     There is substantial evidence that supports the ALJ's finding that there are significant number of jobs that accommodate Plaintiff's RFC.

1.     **PLAINTIFF ARGUES THAT THE ALJ FAILED TO MENTION OR ANALYZE HIS OBESITY AT STEP THREE OF THE SEQUENTIAL EVALUATION PURSUANT TO TITLES II AND XVI:  EVALUATION OF OBESITY, SSR 02-1P, 2000 WL 628049, \*5 (SEPTEMBER 12, 2002).**

SSR 02–1p governs the evaluation of obesity which commonly leads to and perhaps compromises chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. *Id.* Accordingly, the Administration must consider whether obesity may be a factor in both "meet" and "equals" determinations as well as its affect on any physical or mental limitations within the work environment.  *Id.*

A.     **THE REGULATION–SEQUENTIAL EVALUATION STEP 3, THE LISTINGS.**

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing.  We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.  For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  This is especially true of musculoskeletal, respiratory, and cardiovascular impairments.  It may also be true for other coexisting or related impairments, including mental disorders.

For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is "severe," as explained in question six, satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F

17

for a physical impairment imposing an additional and significant limitation of function.  We will find the requirements of listing 12.05 are met if an individual's impairment satisfies the diagnostic description in the introductory paragraph of listing 12.05 and any one of the four sets of criteria in the listing.  In the case of an individual under age 18, we will find that the requirements of listing 112.05 are met if the child's impairment satisfies the diagnostic description in the introductory paragraph of listing 112.05 and any one of the six sets of criteria in the listing. (See sections 12.00A and 112.00A of the listings.)

We may also find that obesity, by itself, is medically equivalent to a listed impairment (or, in the case of a child applying under title XVI, also functionally equivalent to the listings).  For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. (See question eight for further discussion of evaluating the functional effects of obesity, including functional equivalence determinations for children applying for benefits under title XVI.)

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand.  This means that the respiratory system must work harder to provide needed oxygen.  This in turn makes the heart work harder to pump blood to carry oxygen to the body.  Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected.  Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.
However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record.
TITLES II AND XVI: EVALUATION OF OBESITY, 2000 WL 628049, *4 -6 (September 12, 2002).

## B.    THE APPLICATION.

Clearly SSR 02-1p offers guidance about the potential effects obesity has in causing or

contributing to impairments in body systems.  This ruling does not, however, mandate a particular

18

mode of analysis of obesity at step three of the sequential evaluation, as it only provides suggestions as to how obesity, in combination with other impairments, "may" increase the severity of the other limitations.  In the instant case, the ALJ acknowledged his responsibility to consider the effect of Plaintiff's obesity and wrote that at step three of the sequential evaluation, "I must determine whether Mr. Sulecki's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1" (Docket No. 11, p. 108 of 705).  The ALJ continued

> No particular degree of obesity automatically satisfies the requirements of a severe impairment.  I must look to the entire record to determine whether Mr. Sulecki's obesity imposes more than minimal limitations on his ability to perform basic work activities.  Because persons with obesity may experience greater limitations from other impairments than persons who are not obese, I will take into account the amplifying effects of Mr. Sulecki's obesity on his other severe impairments at all steps of the evaluation process (SSR 02-1p).  Mr. Sulecki's obesity significantly magnifies the limitations of his back and knee conditions and is therefore severe within the meaning of the Act when considered in combination with them.

The ALJ's decision reflects that in addition to determining that Plaintiff's obesity constituted a severe impairment, the ALJ considered whether such impairment rose to the listing level.  The ALJ stated that he considered the effect obesity had on Plaintiff's back and knee condition and Plaintiff's ability to perform routine movement and necessary physical activity.

Plaintiff's  references to *Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 304 (6th Cir. 1988), and *Cashin v. Commissioner*, 2013 WL 3791439 (N.D. Ohio 2013), neither resolve the question nor control the answer.  In other words, neither case is dispositive in determining whether the ALJ failed to properly analyze Plaintiff's obesity pursuant to SSR 02-1p at step three of the sequential evaluation.  In *Willbanks,* the Appeals Council failed to follow the rules, instead, discarding the credibility finding of the ALJ who had been intimately involved in the case and disregarding the ALJ's determination of the onset date of disability even though it was

consistent with the evidence available.  In *Cashin*, the ALJ made a general statement that Plaintiff's impairments did not, individually or in combination, meet or equal any of the Listings.  The ALJ failed to mention or analyze whether Plaintiff's fibromyalgia  medically equaled a Listing.

The instant case is distinguishable from *Wilbanks* and *Cashin*.  The ALJ complied with the ruling by acknowledging that Plaintiff's obesity was likely a severe impairment and then advising how he accounted for Plaintiff's weight and its related restrictions affected his back and knee limitations.  Neither the ruling nor any other cited legal authority requires the ALJ to engage in any further analysis of this issue.  Accordingly, this argument lacks merit.

2.    PLAINTIFF CONTENDS THAT THE ALJ FAILED TO MENTION OR CONSIDER DR. CARTER'S FINDING THAT HE CAN ONLY WORK FOR 2-3 HOURS DAILY.

The claim that Plaintiff can only work for 2-3 hours daily because of his inability to concentrate can be traced back to his assertions made in a report to the Ohio DDD.  Apparently Dr. Carter adopted Plaintiff's contention and determined that this assertion translated into a finding that Plaintiff could only work two to three hours per day.  This finding is at odds with Dr. Carter's own finding that Plaintiff made several visits to Dr. Carter's office which was four hours away and that Plaintiff had acquired a relatively good long-term control of his symptoms with prescribed stimulants Adderall and Ritalin (Docket No. 11, pp. 114-115 of 705).  The ALJ's finding accounted for the limitations imposed by Dr. Carter and provided a reasonable explanation for the apparent internal conflict.

The ALJ's decision is based on substantial evidence and such decision stands as the final decision of the Commissioner.

3.    PLAINTIFF ARGUES THAT THE ALJ FAILED TO  CITE GOOD REASONS FOR DISCOUNTING THE DECISION OF DR. LACKEY .

Plaintiff argues that Dr. Lackey was a treating source whose opinions were well supported

by medically acceptable diagnostic techniques.  Because of the significance of this requirement, the failure to articulate "good reasons" for discounting her opinions denotes a lack of substantial evidence.

### A.    THE LAW.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Dallas v. Commissioner of Social Security*, 2013 WL 6626837, *4 (N.D.Ohio,2013) (*citing Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. 2006); 20 C.F.R. § 404.1527(c)(2)).  An opinion should not be rejected merely because it is not entitled to controlling weight.  *Id.* (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir.2009) (*quoting* SSR 96–2p, 1996 SSR LEXIS 9 at *9); *Meece, supra*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)).  Treating source opinions are still entitled to deference and must be weighed using all the factors provided in 20 C.F.R. §§ 416.927 and 404.1527.

If the ALJ determines a treating source opinion is not entitled to controlling weight, the ALJ must provide "good reasons" for discounting the opinion.  *Id.*  Specifically, the ALJ must make it clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.  *Id.* (*citing Rogers v. Commissioner*, 486 F.3d 234, 242 (6th Cir. 2007) (*quoting* SSR 96–2p, 1996 SSR LEXIS 9 at * 5)).  The purpose of this requirement is to make the adverse outcome to the claimant whose physician has declared him disabled, sufficiently clear,  and to ensure that the ALJ applies the treating physician rule and permits meaningful

21

appellate review of the ALJ's application of the rule. *Id* (*quoting Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004)). Failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers*, 486 F.3d at 243).

### B. THE APPLICATION.

The ALJ determined that the appropriate conditions which accord substantial deference, if not controlling deference, to a treating physician's opinions were not met by Dr. Lackey's treatment notes and narratives. The ALJ proceeded to evaluate Dr. Lackey's opinions consistent with the criteria set forth in 20 C.F.R. §§ 416.927 and 404.1527, first acknowledging that Dr. Lackey was an internist. The ALJ proceeded to note that the record evidence did not show Dr. Lackey as an acceptable medical source who provided Plaintiff with treatment or evaluations consistent with accepted medical practice for the type of treatment and/or evaluation required since she only saw Plaintiff at most twice. A third appointment was dedicated to completing a report in support of the disability claim (Docket No. 11, pp. 114; 423-424; 428 of 705).

Furthermore, the observations by Dr. Lackey were inconsistent with Plaintiff's allegations and she ordered diagnostic tests. The test results are not included in the record and Dr. Lackey's opinions are not supported with medically acceptable and clinical diagnostic tests. The ALJ followed the rules in attributing little weight to Dr. Lackey's medical opinions. Accordingly, the Commissioner's decision should be affirmed.

### 4. PLAINTIFF ARGUES THAT THE ALJ FAILED TO MEET THE BURDEN OF PROOF AT STEP FIVE OF THE SEQUENTIAL EVALUATION.

Plaintiff claims that the ALJ's decision that he can meet the exertional demands for light work is not supported by substantial evidence because it limits him to standing and walking less than

four hours out of a total 8-hour workday.  Plaintiff suggests that this explicit finding is a *de facto* exclusion for light work, thus relegating him to sedentary work.

### A.    THE LAW.

Light work is defined as work which involves lifting no more than 20 pounds with frequent lifting of up to 10 pounds.  20 C.F.R. § 416.967(b) (West 2014).  The regulation further instructs that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of leg and arm controls."  A full range of light work requires standing or walking, off and on, for a total of approximately six hours of an 8–hour workday.  SSR 83–10 does not explicitly preclude any light work for an individual who cannot stand or walk for six hours of an 8–hour work day.  Rather, SSR 83-10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday."

### B.    THE APPLICATION.

Plaintiff argues that the limitations set forth in the ALJ's RFC finding that Plaintiff can stand and walk up to four hours out of a total 8-hour workday are so restrictive as to effectively preclude him from performing even a limited range of light work as it is defined in the regulations.  The Magistrate disagrees.  SSR 83–10 expands upon the definition of light work but it does not preclude *any* light work for an individual who cannot stand or walk for a total of approximately six hours of an 8–hour workday.  The ruling provides that the full range of light work requires standing or walking for a total of approximately six hours.

It is clear that Plaintiff cannot perform a full range of light work and the ALJ did not find that

23

he could.  Instead, based on the medical evidence, the ALJ determined that Plaintiff can stand and/or walk up to 4 hours of an 8–hour day, and then relied upon testimony from the VE indicating that there are jobs at the light exertional level which an individual who is limited to standing and/or walking 4 hours in an 8–hour workday can perform.  Accordingly, the Magistrate is satisfied that the ALJ's RFC finding that Plaintiff can perform less than a full range of light work is consistent with SSR 83-10 and the regulations and it is otherwise supported by the record.

5.     **PLAINTIFF SUGGESTS THAT THE HYPOTHETICAL QUESTIONING WAS FLAWED.**

The essence of this claim is that the RFCs of Drs. Carter and Lackey were not adequately captured in the hypothetical questions posed to the VE.

A.     **THE LAW**.

The RFC determination sets out an individual's work-related abilities despite their limitations.  *Moore v. Commissioner of Social Security*, 2013 WL 6283681, *4 (N.D.Ohio 2013) (*See* 20 C.F.R. § 416.945(a)).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *Id.* (*See* 20 C.F.R. § 416.927(d)(2)).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *Id.* (*See* 20 C.F.R. § 416.927(d)(3)).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence.  *Id.* (*See* 20 C.F.R. § 416.946(c)). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Id.* (*citing Carter v. Commissioner of Social Security*, 2012 U.S. Dist. LEXIS 40828, 2012 WL 1028105 at * 7 (W.D.Mich. Mar.26, 2012) (*citing Mullins v. Secretary of Health & Human Services*, 680 F.2d 472 (6th Cir.1982); *Reynolds v. Commissioner of Social Security*, 424 Fed. Appx. 411, 414 (6th Cir.2011); *Vance v. Commissioner of Social Security*, 260

24

Fed. Appx. 801, 807 (6th Cir.2008)).

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *Id.* (*See Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir.1987)). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *Id.* (*See Blacha v. Secretary of Health & Human Services*, 927 F.2d 228, 231 (6th Cir.1990)). In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible. *Id.* (*citing Griffeth v. Commissioner of Social Security*, 217 Fed. Appx. 425, 429 (6th Cir.2007) (*citing Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1235 (6th Cir.1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *Id.* (*See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir.1994)).

### B. THE APPLICATION.

The questions asked of the VE fairly incorporated the material facts reasonably relevant to Plaintiff's physical and mental state. Plaintiff's argument that the hypothetical questions were flawed because they did not include the RFC findings of Drs. Carter and Lackey misconstrues the purpose of a hypothetical in determining disability. The ALJ and Plaintiff's counsel posed one or more questions, asking the VE to assume a hypothetical individual with specified limitations that the ALJ may or may not ultimately determine to be applicable to Plaintiff. The VE's testimony constitutes substantial evidence because the ALJ's hypothetical included all of Plaintiff's impairments. The ALJ did not need to expressly state the limitations posited by Drs. Carter and Lackey. Even if he had, he was not bound by VE testimony in response to the hypothetical that failed to set forth only those impairments the ALJ accepted as true. Thus, to the extent that Plaintiff

25

relies on her contention that the ALJ's hypothetical was deficient because it did not include the RFC findings of Drs. Carter and Lackey, the argument fails.

## V.   CONCLUSION

The Magistrate has carefully and independently reviewed the record and concludes that based on the foregoing analysis, the decision of the Commissioner is affirmed.

**IT IS SO ORDERED**.

Vernelis K. Armstrong
United States Magistrate Judge

Date: May 29, 2014

26